La Jueza Asociaba Señora Fiol Matta
emitió la opinión del Tribunal.
Debemos resolver si los doctores que participan del programa del Plan de Práctica Médica Intramural Universitaria (PPMIU) del Recinto de Ciencias Médicas están protegidos por la inmunidad que otorga el Art. 41.050 del Código de Seguros de Puerto Rico, 26 L.P.R.A. see. 4105, a los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias e instrumentalidades. Por las razones que exponemos a continuación, resolvemos que sí.
r—i
Los peticionarios, el Sr. Roberto Rodríguez Ruiz y la Sra. Erica Ortiz Cancel, presentaron, por sí y en representación de la Sociedad Legal de Bienes Gananciales compuesta por ambos y de su hija menor V.R.O., una demanda sobre daños y peijuicios por impericia médica contra el Hospital San Jorge, el Dr. Juan A. Vigo Prieto y la Sociedad Legal de Bienes Gananciales que éste compone junto a su esposa, el Centro Médico de Puerto Rico, el Hospital Pediátrico Universitario, la Universidad de Puerto Rico y sus respectivas aseguradoras. En la demanda, los peticionarios expusieron que su hija, paciente de hidrocefalia desde su nacimiento, fue atendida y operada en el Hospital San Jorge de apendicitis; que luego de ser dada de alta *854 tuvo que ser llevada nuevamente al hospital, donde se le diagnosticó encefalitis ocasionada por una infección. Alegan que el caso de su hija le fue referido en el Hospital San Jorge al doctor Vigo Prieto para una consulta y que, a instancias de éste, la niña fue trasladada al Hospital Pediátrico Universitario. Según la demanda, la menor tuvo que esperar tres días en el Hospital Pediátrico Universitario para ser atendida adecuadamente. Luego de esos tres días, la menor fue operada por el doctor Vigo Prieto.
Para la fecha de los hechos, el doctor Vigo Prieto era Catedrático Auxiliar de la Universidad de Puerto Rico del Recinto de Ciencias Médicas. Participaba también del programa del PPIU del Recinto a través del grupo de neurocirugía.(1) Además, tenía una oficina en el Hospital San Jorge y privilegios para operar en este hospital. Los peticionarios alegan que la atención tardía del doctor Vigo Prieto y el traslado de la niña al Hospital Pediátrico Universitario, cuando podía atenderse en el Hospital San Jorge, causaron que ésta sufriera daños físicos y cerebrales que no padecía anteriormente y que la afectarán durante toda su vida. Por ello solicitan que el doctor los indemnice. El doctor Vigo Prieto contestó la demanda; negó esencialmente las alegaciones y levantó, en lo pertinente y como defensa afirmativa, que atendió a la menor V.R.O. en el Hospital Pediátrico Universitario como empleado de la Universidad de Puerto Rico, a través del grupo de neurocirugía del PPMIU del Recinto de Ciencias Médicas, y que en ningún momento intervino con la menor cuando ésta visitó el Hospital San Jorge.
Luego de esto, el doctor Vigo Prieto presentó una moción de sentencia sumaria en la que solicitó que se desestimara *855 la demanda instada en su contra, ya que él estaba cobijado por la inmunidad otorgada por el Art. 41.050 del Código de Seguros de Puerto Rico, supra, a los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias e instrumentalidades. Los peticionarios se opusieron a la solicitud de sentencia sumaria. Argumentaron, en primer lugar, que las alegaciones de la demanda contra el doctor Vigo Prieto fueron en su carácter como médico del Hospital San Jorge. También expresaron su interés en conocer el tipo de relación contractual que mantenían el doctor y la Universidad de Puerto Rico. Por último, solicitaron que, antes de resolver la moción de sentencia sumaria, se finalizara el descubrimiento de prueba de modo que se pudiera aclarar la relación del doctor Vigo Prieto con el Hospital San Jorge y con la Universidad de Puerto Rico, y cuál fue su intervención con la paciente en el Hospital San Jorge. En esencia, los peticionarios plantearon que existía controversia de hechos y que era necesario ordenar al doctor Vigo y a la Universidad de Puerto Rico a que produjeran ciertos documentos que permitieran evaluar si el doctor estaba protegido por la norma de inmunidad.(2)
En septiembre de 2001, el doctor Vigo Prieto presentó nuevamente una moción de sentencia sumaria. En noviembre de ese año se celebró una vista en la cual se discutió la solicitud de sentencia sumaria. Luego de la vista, el tribunal de instancia le concedió un término adicional a las partes para que finalizaran el descubrimiento de prueba. Las controversias en cuanto al descubrimiento de prueba con *856 tinuaron hasta que el Tribunal de Primera Instancia dictó una sentencia sumaria parcial en septiembre de 2002.(3) En ésta, desestimó la demanda en cuanto al doctor Vigo Prieto, según había resuelto “en corte abierta” el 22 de mayo de 2001.(4)
Inconforme con ese dictamen, los peticionarios acudieron ante el entonces Tribunal de Circuito de Apelaciones. Los peticionarios entendían que se había equivocado el Tribunal de Primera Instancia al resolver que al doctor Vigo Prieto le cobijaba la inmunidad de los médicos empleados por el Estado, porque existía una controversia real de hechos sobre si éste había incurrido en actos u omisiones negligentes como médico del Hospital San Jorge y si el galeno había actuado como contratista independiente o como empleado del Hospital Pediátrico Universitario.
El foro apelativo confirmó la sentencia en cuanto a la inmunidad del doctor Vigo Prieto en su práctica en el Hospital Pediátrico Universitario y la revocó en cuanto a su práctica en el Hospital San Jorge. Entendió que la sentencia de instancia se extendía a las reclamaciones fundamentadas en la relación del doctor Vigo Prieto con ese *857 hospital.(5) Los peticionarios acuden ante nosotros y nos señalan que el tribunal de apelativo erró al confirmar al Tribunal de Primera Instancia en cuanto a la extensión de la inmunidad del Art. 41.050 del Código de Seguros de Puerto Rico, supra, al doctor Vigo Prieto por sus actuaciones en el Hospital Pediátrico Universitario, cuando existe una controversia de hechos sobre si, al atender a la menor a través del PPMIU de neurocirugía, éste lo hizo como contratista independiente o como empleado de dicho hospital.
Por lo tanto, debemos resolver si el doctor Vigo Prieto estaba protegido, mientras atendió a la menor como parte del grupo de neurocirugía del programa del PPMIU del Recinto de Ciencias Médicas, por la inmunidad que otorga el Art. 41.050 del Código de Seguros de Puerto Rico, supra, a los médicos que son empleados del Estado Libre Asociado de Puerto Rico. Además, debemos resolver si, en efecto, el Tribunal de Primera Instancia adjudicó la posible responsabilidad del doctor Vigo Prieto en cuanto al tratamiento de la menor en el Hospital San Jorge y su traslado al Hospital Universitario, y de ser así, si procede adjudicar en torno a dicha responsabilidad de manera sumaria en esta etapa del procedimiento.
II
En Puerto Rico hemos reconocido desde hace más de cinco décadas que los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias e instrumentalidades, gozan de inmunidad en pleitos de impericia profesional relacionados con el desempeño de su labor. Véanse: Ley Núm. 74 de 30 de mayo de 1976 (26 L.P.R.A. ant. see. 4101 et seq.); Lind Rodríguez v. E.L.A., *858 112 D.P.R. 67 (1982); Flores Román v. Ramos González, 127 D.P.R. 601 (1990); Art. 41.050 del Código de Seguros de Puerto Rico, supra. Curiosamente, esta protección se encuentra regulada en el Código de Seguros de Puerto Rico, no en el Código Civil dentro del capítulo sobre las obligaciones que nacen de la culpa o la negligencia. El legislador decidió colocar esta protección en el mismo artículo que pretende garantizar que la población puertorriqueña esté protegida en los casos de impericia médica al exigirle a los médicos que posean un seguro de responsabilidad profesional. Véase la Exposición de Motivos de la Ley Núm. 4 de 30 de diciembre de 1986 (1986 Leyes de Puerto Rico 730). En la actualidad, este artículo del Código de Seguros de Puerto Rico provee, en parte y en lo pertinente, lo siguiente:
Todo profesional de servicios de salud e institución de cuidado de salud deberá radicar anualmente prueba de su responsabilidad financiera por la cantidad de cien mil dólares (100,000) por incidente o hasta un agregado de trescientos mil dólares (300,000) por año. El Comisionado podrá requerir límites hasta un máximo de quinientos mil dólares (500,000) por incidente médico y un agregado de un millón de dólares (1,000,000) por año, en los casos de instituciones de cuidado de salud y de aquellas clasificaciones tarifarias de profesionales de servicios de salud dedicados a la práctica de especialidades de alto riesgo .... Están exentos de esta obligación aquellos profesionales de servicios de salud que no ejercen privadamente su profesión y trabajan exclusivamente como empleados de instituciones de cuidado de salud privadas, siempre y cuando estuvieren cubiertos por la prueba de responsabilidad financiera de éstas. También están exentos de esta obligación los profesionales de servicios de salud que presten servicios exclusivamente como empleados o contratistas del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios y que no ejercen privadamente su profesión. Están exentas, además, las instituciones de cuidado de salud que pertenezcan y sean operadas o administradas por el Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios.
Ningún profesional de servicios de salud podrá incluido como parte demandada en una acción civil de reclamación de *859 daños por culpa o negligencia por impericia profesional (malpractice) que cause en el desempeño de su profesión, mientras dicho profesional de servicios de salud actúe en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, e instrumentalidades, El Centro Comprensivo de Cáncer de la Universidad de Puerto Rico y municipios o contratistas de éstos, mientras actúe en cumplimiento de sus deberes y funciones en las áreas de obstetricia, ortopedia, cirugía general o trauma en una instalación médico-hospitalaria propiedad del Estado Libre Asociado, sus dependencias, instrumentalidades y/o municipios, independientemente de si dicha instalación está siendo administrada u operada por una entidad privada.
En toda acción civil en que se íe reclamen daños y perjuicio^ a la Universidadl de Puerto Rico en todo caso en que recaiga sentencia por actos constitutivos de impericia médica hospitalaria (malpractice) que cometan los empleados, miembros de la facultad, residentes o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico o médicos que presten servicios por contrato con la Universidad de Puerto Rico en el desempeño de sus tareas institucionales; ... o cuando recaiga sentencia por actos u omisiones constitutivos de culpa o negligencia directamente relacionados con la operación por la Universidad de Puerto Rico de una institución de cuidado de salud, se sujetará a la Universidad de Puerto Rico ... a los límites de responsabilidad y condiciones que las sees. 3077 a 3092a del Título 32, impone para exigirle la responsabilidad al Estado Libre Asociado de Puerto Rico en similares circunstancias. Art. 41.050 del Código de Seguros de Puerto Rico, supra.(6)
Nuestra última expresión sobre este artículo en cuanto a la inmunidad de los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios, fixe en el caso Flores Román v. Ramos González, supra. En ese caso reiteramos la norma que esbozáramos originalmente en el caso Lind Rodríguez v. E.L.A., supra, de que este artículo del Código de Seguros de Puerto Rico exime de responsabili *860 dad no sólo a los médicos que trabajan exclusivamente para el Estado, sino también a los médicos que al mismo tiempo ejercen la práctica privada mientras actúan en el cumplimiento de su deber como empleados del Estado. Establecimos, entonces, que para ser protegido por la inmunidad estatutaria se debe ser un profesional en el cuidado de la salud y que los daños ocasionados por su impericia deben haber surgido mientras se actúa en cumplimiento de sus deberes y funciones profesionales como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios. Flores Román v. Ramos González, supra, pág. 606.
Asimismo, determinamos que la inmunidad, además de proteger a los médicos que ocupan puestos de carrera o de confianza en el gobierno del E.L.A., puede cobijar a los médicos que tengan contratos con el Gobierno. En cuanto al personal bajo contrato, establecimos que hay que determinar si al causar el daño el médico cumplía con las funciones de un empleado de la agencia y tenía en realidad las responsabilidades asignadas a un puesto dentro de la estructura organizativa o si el grado de control ejercido por el patrono sobre su trabajo era análogo al de un empleado. Establecimos que estos médicos están cobijados por la inmunidad si luego de analizar ciertos factores se determina que la relación del médico con el Gobierno no es de contratista independiente. Los factores que se han de considerar para saber si alguien es contratista independiente del Gobierno son los siguientes: (1) la forma como los servicios fueron pagados; (2) la inversión en equipo científico y en facilidades o el grado de dependencia en el equipo suministrado por el Gobierno; (3) si se le requiere un seguro de responsabilidad profesional, y (4) el grado de independencia en su juicio profesional. Flores Román v. Ramos González, supra, pág. 609. En cuanto al factor del grado de independencia en su juicio profesional, es incuestionable que, para que los médicos ejerzan su labor adecuadamente, deben tener el mayor grado de independencia. *861 Por lo tanto, este factor no es importante cuando se trata de profesionales de la salud, así que no debe ser considerado al momento de determinar si un médico está protegido por la inmunidad del Art. 41.050 del Código de Seguros de Puerto Rico, supra.
Lo anterior implica que, cuando nos enfrentamos al caso de un médico que esté trabajando para el Gobierno por contrato, es necesario determinar, en primer lugar, la naturaleza del vínculo contractual particular. De ello dependerá si está cobijado por la inmunidad y, por consiguiente, si procede la desestimación de la demanda en su contra. Después de todo, la inmunidad dispuesta por ley no es meramente una defensa; se trata más bien de la inexistencia de una causa de acción. Lind Rodríguez v. E.L.A., supra, pág. 69.
Ahora bien, antes de evaluar la relación del doctor Vigo Prieto con el Recinto de Ciencias Médicas, a la luz de los factores que mencionáramos, debemos considerar si nuestras expresiones en Flores Román v. Ramos González, supra, continúan vigentes luego de las varias enmiendas que desde esa opinión ha sufrido el Art. 41.050 del Código de Seguros de Puerto Rico, supra.
Ill
La inmunidad que se recoge hoy en el Art. 41.050, supra, fue incluida en el Código de Seguros de Puerto Rico por primera vez en 1976, cuando se añadió el Capítulo 41 a este Código. Véase Ley Núm. 74, supra. La norma se encontraba entonces en el Art. 41.080 (26 L.P.R.A. sec. 4108) que proveía, al igual que el referido Art. 41.050 en la actualidad, esencialmente dos cosas. Primero, que los profesionales en el cuidado de la salud que no ejercían privadamente su profesión y prestaban servicios exclusivamente como empleados del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios estaban exentos de mostrar que tenían un seguro de responsabilidad. Art. 41.080 de la Ley Núm. 74, supra. La *862 ley proveía, en segundo lugar, que ningún profesional de servicios de la salud podía ser incluido como parte demandada en una acción civil de reclamación de daños por culpa o negligencia por impericia profesional por actos cometido en el desempeño de su profesión, mientras actuaba en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios. En otras palabras, estos profesionales no tenían que adquirir un seguro de responsabilidad, precisamente porque la ley eliminaba cualquier causa de acción en su contra.
Esta ley fue enmendada en 1978, pero la inmunidad de los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios no fue alterada. Véase la Ley Núm. 55 de 18 de julio de 1978 (1978 Leyes de Puerto Rico 567). En 1986 se redactó un nuevo Capítulo 41 del Código de Seguros de Puerto Rico y se derogó el anterior. Véase Ley Núm. 4, supra. Este nuevo capítulo también reconoció la inmunidad de los médicos empleados del Estado Libre Asociado de Puerto Rico, al eximirles de la responsabilidad de presentar prueba de tener un seguro de responsabilidad y al disponer expresamente que no podían ser incluidos como parte demandada en una acción civil de reclamación de daños por culpa o negligencia por impericia médica. Además, la ley de 1986 incluyó, entre los que están exentos de presentar evidencia de tener seguro, a las instituciones de cuidado de la salud que pertenezcan y sean operadas o administradas por el Estado Libre Asociado de Puerto Rico y a los médicos que trabajan exclusivamente con instituciones privadas, si éstas los incluyen dentro de sus seguros de responsabilidad.(7) Sin embargo, aunque se les eximió de presentar prueba sobre el seguro de responsabilidad, no se les eximió de su responsabilidad. Por eso, ninguna de las instituciones, o los médicos añadidos a la exención, gozan *863 de inmunidad al amparo del nuevo esquema del Código Seguros de 1986.
Esto no representaba problema para aquellos médicos en la práctica privada que trabajaran exclusivamente para instituciones privadas, quienes tendrían la cubierta del seguro de responsabilidad para casos de impericia que sus patronos debían obtener a nombre suyo. No obstante, las instituciones de salud operadas o administradas por el Estado Libre Asociado de Puerto Rico seguían sujetas a pagar por los daños que fueran resultado de la impericia de los médicos u otras personas que trabajaran en sus instalaciones.
En 1994 esta situación motivó a los legisladores a enmendar nuevamente la sección de responsabilidad financiera del Capítulo 41 del Código de Seguros de Puerto Rico. Surgió la preocupación de que la Universidad de Puerto Rico, que se entendía no cobijada por los límites que impone la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. see. 3077 et seq.), tuviera que responder por la totalidad de los daños que pudieran causar los galenos que trabajaban en sus instalaciones, quienes, sin embargo, estaban inmunes a cualquier acción de daños.(8) La Ley Núm. 98 de 24 *864 de agosto de 1994 (1994 Leyes de Puerto Rico 494, 495) sujeta a los límites de responsabilidad de la Ley Núm. 104, supra, toda acción contra la Universidad de Puerto Rico por daños y perjuicios o impericia médico-hospitalaria de los empleados, miembros de la facultad, residentes o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico, en el desempeño de sus tareas institucionales o por actos de culpa o negligencia relacionados con la operación de una institución de cuidado de la salud la Universidad.(9)
Esta enmienda no cambió la inmunidad de los médicos que trabajan para el Estado Libre Asociado, por lo cual nuestros pronunciamientos en Flores Román v. Ra-mos González, supra, siguieron vigentes. Es más, esta enmienda recogió parte de nuestras expresiones en el caso Flores Román v. Ramos González, supra, pues reconoció, entre las personas que pueden beneficiarse de la inmunidad, es decir, entre aquellos por cuya impericia respondería la Universidad de Puerto Rico, a los médicos bajo contrato con la Universidad dentro del límite que impone la Ley Núm. 104, supra. Se impone esta interpretación de la enmienda, ya que de otra forma habría que considerar a estos médicos como contratistas independientes. En ese caso, para que la Universidad respondiera, sería necesario probar que ésta no le requirió al médico que tomara las medidas de seguridad necesarias para su práctica o que no ejerció la debida diligencia en tomar estas medidas. Véanse: Bonet v. Municipio de Barceloneta, 87 D.P.R. 81 (1963); Barrientos v. Gob. de la Capital, 97 D.P.R. 552 (1969); López v. Gob. Mun. de Cataño, 131 D.P.R. 694 *865 (1992); Pons v. Engebretson, 160 D.P.R. 347 (2003). Esta situación, en la cual la Universidad respondería por las acciones de sus contratistas independientes, está contemplada en el tercer escenario que vislumbra la enmienda de 1994, al establecer que la Universidad estará sujeta a los límites de la Ley Núm. 104, supra, cuando recaiga sentencia por actos constitutivos de culpa o negligencia directamente relacionados con la operación por parte de ésta de una institución de cuidado de la salud.
Al mismo tiempo, la enmienda de 1994 arrojó luz sobre quiénes los legisladores consideran que son los profesionales exentos de cumplir con el deber de evidenciar que poseen un seguro y quiénes están cobijados por la inmunidad por ser empleados del Estado Libre Asociado. Entre estos profesionales se encuentran los empleados, miembros de la facultad, residentes, estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico en el desempeño de sus tareas institucionales.(10)
Aunque la última enmienda que se le hizo al Art. 41.050, supra, no trajo ningún cambio en cuanto al asunto que se nos plantea en este caso, sí introdujo cambios que inciden en las normas que expusiéramos en Flores Román v. Ramos González, supra. En 2004, los legisladores, preocupados por los efectos que trajo la privatización de la mayor parte de las instalaciones de salud del Gobierno y la posterior recuperación de algunas de éstas, enmendaron el *866 artículo de responsabilidad financiera, para otorgarle inmunidad en casos de impericia profesional a los profesionales que prestan ciertos servicios específicos. Según la enmienda, tienen inmunidad los especialistas en obstetricia, ortopedia, cirugía general y trauma que prestan servicios exclusivamente en instalaciones médico hospitalarias propiedad del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades o sus municipios, independientemente de si la institución es administrada u operada por alguna empresa privada.
Para lograr esto se hicieron dos cambios al Art. 41.050, supra. El primero fue incluir entre los médicos exentos de presentar prueba de responsabilidad médica a los profesionales de la salud que trabajan como contratistas del Estado Libre Asociado. El segundo fue extender la inmunidad a los contratistas ya mencionados.(11) Estos profesionales son también los contratistas que están exentos de presentar la prueba de responsabilidad; en otras palabras, están exentos de tener un seguro personal. Así lo evidencia la Exposición de Motivos de la ley y su historial legislativo.(12)
*867 Esta enmienda resulta, por lo tanto, en un cambio importante a la norma que adoptamos en Flores Román v. Ramos González, supra. Hoy es posible que un contratista independiente tenga inmunidad bajo el Art. 41.050 del Código de Seguros de Puerto Rico, supra, siempre y cuando sea uno de los contratistas incluidos en la ley. En conclusión, la norma vigente para saber si un médico goza de inmunidad contra demandas por impericia es que si luego de analizar los primeros tres factores que explicamos en el caso Flores Román v. Ramos González, supra,(13) se determina que la relación del médico con el Gobierno no es de contratista independiente, éste estará cobijado por la inmunidad establecida en el Art. 41.050, supra. Esta inmu *868 nidad también aplicará a aquellos médicos que sean contratistas de una instalación médico-hospitalaria propiedad del Estado Libre Asociado, sus dependencias, instrumentalidades o municipios, sin importar si la instalación es administrada u operada por una entidad privada, exclusivamente en las especialidades de obstetricia, ortopedia, cirugía general o trauma. Así que los médicos que trabajen para el Estado o para una entidad del Estado administrada por una entidad privada en estas cuatro áreas, siempre estarán cubiertos por la inmunidad, sean contratistas independientes o no.
Ya que el trabajo del doctor Vigo Prieto, como parte del PPMIU del Recinto de Ciencias Médicas, a través del grupo de neurocirugía no está dentro de las cuatro áreas de trabajo antes mencionadas, nos toca determinar si su labor bajo el plan equivale a la de un empleado o a la de un contratista independiente. Para esto es necesario estudiar la estructura y el propósito de los PPMIU del Recinto de Ciencias Médicas.
IV
En 1996, los legisladores autorizaron a la Universidad de Puerto Rico a crear en sus unidades los Planes de Práctica Médica Intramural Universitaria. Ley Núm. 174 de 31 de agosto de 1996 (18 L.P.R.A. see. 612). Entre los propósitos de la creación de estos planes en los distintos recintos se encuentra ofrecer a la facultad opciones de retribución acordes con las realidades económicas y profesionales de Puerto Rico, crear recursos económicos adicionales para facilitar el reclutamiento y la retención del personal docente, fortalecer el presupuesto institucional y complementar el ingreso del personal que presta los servicios, así como utilizarlos de taller de práctica para los estudiantes. Véase Exposición de Motivos de la Ley Núm. 174, supra, 1996 Leyes de Puerto Rico 772. Al amparo de los PPMIU, las unidades de la Universidad pueden contratar con personas e instituciones públicas y privadas, domésticas o extranje *869 ras, para que su personal les preste servicios. Estos servicios son prestados de forma voluntaria por el personal docente y pueden darse durante su horario regular o fuera de éste, sin menoscabo de su carga académica. Los PPMIU deben ser autosuficientes. Los fondos que recauda la Universidad según estos planes son considerados fondos públicos, y son consignados en un fondo especial en las unidades que los generen. Los fondos que generan los PPMIU se utilizan para sufragar los gastos directos del programa y para pagar al personal participante. También se utiliza el dinero para fortalecer otros planes con menor demanda, para atender gastos no recurrentes prioritarios dentro de la misma unidad de la Universidad y para hacer una aportación anual al Fondo General de la Universidad de Puerto Rico. Ley Núm. 174, supra. Los contratos hechos al amparo de los PPMIU son otorgados a nombre de la Universidad de Puerto Rico y son suscritos en representación de ésta por el Rector de la unidad correspondiente. Art. XII, Certificación Núm. 123 1996-97 de la Junta de Síndicos de la Universidad de Puerto Rico.(14)
Cada unidad del sistema establece la estructura de sus PPMIU, en conformidad con el reglamento aprobado por la Junta de Síndicos para esto. Por consiguiente, debemos estudiar las Normas y Procedimientos del Plan de Práctica Intramural del Recinto Ciencias Médicas, para analizar si el doctor Vigo Prieto es un médico cobijado por la inmunidad del Art. 41.050, supra, a la luz de los factores de Flores Román v. Ramos González, supra.
Las normas del Recinto de Ciencias Médicas establecen, en cuanto a la utilización y al manejo de fondos, que toda recaudación por servicios prestados bajo los PPMIU se ingresarán a un fondo especial, que a su vez tendrá cuentas para cada PPMIU del Recinto. Una vez se ingresan los recaudos por los servicios, sólo se autorizarán desembolsos cuando las cuentas tengan balance disponible y se hayan cubiertos los gastos de operación del PPMIU. El Departa *870 mentó de Recursos Fiscales del Recinto es el encargado de cobrar por los servicios, de identificar los deudores y de hacer las gestiones para el recobro. Luego de que se tienen los ingresos netos, éstos se distribuyen entre el fondo general, el fondo institucional, el fondo del decanato, la facultad y el personal participante. Estos fondos sirven para fortalecer el presupuesto de la Universidad de Puerto Rico, del Recinto de Ciencias Médicas y de los distintos decanatos del Recinto. Los fondos que se distribuyen a los docentes y al otro personal participante se pagan como honorarios profesionales. Véase Normas y Procedimientos del Plan de Práctica Intramural Universitaria del Recinto Ciencias Médicas de 1998, págs. 6-9. Por esta razón, el dinero que paga el PPMIU a los doctores sujeto a retención se informa en el Formulario Núm. 480.6 y los médicos deben cumplir con las leyes fiscales que afectan a los contratistas independientes. Por otra parte, el dinero que reciben los profesores por sus servicios no se puede utilizar para cotizar en el Sistema de Retiro de los Empleados de la Universidad de Puerto Rico. Sec. 100.9.1, Certificación Núm. 124 1996-97 de la Junta de Síndicos de la Universidad de Puerto Rico. En otras palabras, los PPMIU del Recinto de Ciencias Médicas funcionan de la manera siguiente. El Recinto presta sus instalaciones y su equipo a los médicos para que rindan servicios a instituciones privadas y públicas. Los médicos sólo prestan sus servicios. El Recinto se encarga de manejar todos los asuntos financieros relacionados con los PPMIU. Una vez se obtienen las ganancias, éstas se distribuyen entre el Recinto y los médicos. De esta manera, la Universidad se asegura de mantener a su facultad y de contar con los recursos para sus funciones.
A la luz de este esquema, queda claro que los servicios no son pagados directamente a los médicos y que éstos no realizan ninguna inversión en equipo científico y en instalaciones, sino que dependen del equipo suministrado por el Gobierno. Por lo tanto, en cuanto a los dos primeros factores que debemos considerar al amparo de la norma de Flores Román v. Ramos González, supra, los médicos serían *871 empleados del Recinto para los efectos del Art. 41.050 del Código de Seguros, supra.
En cuanto a si se les requiere un seguro de responsabilidad profesional a los doctores del PPMIU, las Normas y Procedimientos del Plan de Práctica Intramural Universitario del Recinto Ciencias Médicas nada disponen.(15) Ante esta situación, y considerados el propósito de los PPMIU y su funcionamiento, debemos concluir que los médicos son considerados empleados del Recinto cubiertos, entonces, por la institución. Por lo tanto, para efectos del Art. 41.050 del Código de Seguros de Puerto Rico, supra, deberían ser considerados como empleados del Recinto y cobijados por la inmunidad allí establecida.
En este caso, los peticionarios sostienen que el doctor Vigo Prieto tenía un seguro de impericia profesional. Sin embargo, aun si este seguro cubriera al doctor por sus actuaciones en el Recinto y no sólo sus actuaciones en su práctica privada, esto no impide que al doctor Vigo Prieto se le extienda la inmunidad dispuesta por el referido Art. 41.050. Adquirir un seguro no elimina la protección contra demandas que provee la ley..
Al evaluar la organización de los PPMIU a la luz de los tres factores de Flores Román v. Ramos González, supra, debemos colegir que los doctores que prestan servicios bajo los PPMIU son empleados del Recinto de Ciencias Médicas cobijados por la inmunidad del Art. 41.050 del Código de Seguros de Puerto Rico, supra.
V
Por último, al igual que el hoy Tribunal de Apelaciones, entendemos que existe una controversia sustancial en *872 cuanto si el doctor Vigo Prieto tiene alguna relación con el tratamiento de la menor V.R.O. en el Hospital San Jorge. Sin embargo, contrario a ese foro, concluimos que la sentencia del Tribunal de Primera Instancia no se extendió a esa controversia, sino que sus efectos se limitaron a las acciones realizadas por el doctor en el Hospital Pediátrico Universitario. A eso se contrae la minuta de 22 de mayo de 2001, a la cual nos refiere, a su vez, la sentencia de instancia. Ese asunto no estaba, pues, ante la consideración del foro apelativo, por lo que encontramos que su decisión de revocar la sentencia en cuanto a este aspecto fue innecesaria.
VI
Por todo lo anterior, resolvemos que el Tribunal de Primera Instancia tuvo razón al resolver que las actuaciones del doctor Vigo Prieto en el Hospital Pediátrico Universitario están cobijadas por la inmunidad del Art. 41.050. Se confirma, por lo tanto, la decisión del Tribunal de Apelaciones en cuanto a este aspecto. Se devuelve el caso al Tribunal de Primera Instancia para que se dilucide si el doctor Vigo Prieto tiene alguna relación con el tratamiento de la menor V.R.O. en el Hospital San Jorge y se determine la responsabilidad, si alguna, que por ello le corresponda.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita. El Juez Asociado Señor Rivera Pérez no interviene y la Jueza Asociada Señora Rodríguez Rodríguez disintió sin opinión escrita.

 Mediante estos programas, la facultad y el personal administrativo del Recinto de Ciencias Médicas se organiza en grupos para ofrecer servicios médicos, en las instalaciones del recinto. Las ganancias que resultan de este esfuerzo se dividen entre el recinto y el personal docente y administrativo que participa del programa. El propósito primordial es ofrecerle un incentivo económico al personal docente para que no abandone la cátedra por la práctica privada de la Medicina. Para una discusión más profunda sobre el Plan de Práctica Médica Intramural Universitaria (PP-MIU), véase la Parte IV de esta opinión.

 En específico, los peticionarios deseaban que el Tribunal le ordenara a los demandados entregarle una copia de los documentos siguientes: la deposición tomada al doctor Vigo Prieto el 29 de agosto de 2001; el informe de la consulta del Hospital San Jorge de 22 de julio de 1997, en el cual alegadamente hay una anotación que indica que se le dirigió una consulta al doctor Vigo Prieto sobre la menor V.R.O. a las 3:50 pm; el historial de pagos hechos por Triple S por los servicios prestados para el tratamiento de la ruña V.R.O.; las normas y procedimientos del PPMIU; el PPMIU; las Normas Provisionales Complementarias Especiales al Reglamento para la Creación y Administración de Planes de Práctica Intramural para el Recinto de Ciencias Médicas de la Universidad de Puerto Rico; la Certificación Núm. 124 del período de 1996-1997 aprobada por la Junta de Síndicos de la Universidad de Puerto Rico con el propósito de incluir en el Reglamento General de la Universidad las disposiciones relacionadas con la creación del PPMIU.

 El 17 de enero de 2002, los apelantes solicitaron nuevamente que se le ordenara a la Universidad de Puerto Rico que produjera ciertos documentos. El 17 de abril de 2002, la Universidad de Puerto Rico presentó una moción en la que informó que le había enviado a los apelantes los documentos solicitados. El 26 de junio de 2002, en la conferencia con antelación al juicio, las partes argumentaron sus posiciones. Además, los peticionarios solicitaron que se les permitiera descubrir prueba en tomo a las gestiones del doctor Vigo Prieto en el Hospital San Jorge. Luego de la conferencia con antelación al juicio, el tribunal dispuso que se dejaba sometida la moción del doctor Vigo Prieto, en la cual se solicitaba que se dictara una sentencia sumaria parcial e igualmente el asunto sobre la necesidad de la información que solicitaron los peticionarios.
El 19 de agosto de 2002, los peticionarios se opusieron nuevamente a que se dictara la sentencia sumaria a favor del doctor Vigo Prieto y solicitaron que no se dictara sentencia hasta tanto se finalizara el descubrimiento de pmeba relacionado con: las operaciones realizadas por el doctor Vigo Prieto en el Hospital San Jorge y todo el expediente de facturación de dicho médico, y el historial de facturación de los planes médicos Triple S y GA Life, correspondiente a la paciente V.R.O. Los peticionarios señalaron, además, que interesaban tomarle una deposición al funcionario de la Universidad de Puerto Rico encargado de todo lo relacionado con el PPMIU.

 De la minuta de 22 de mayo de 2001 se desprende que el Tribunal de Primera Instancia declaró “con lugar” la solicitud de sentencia sumaria, en cuanto a la intervención del doctor Vigo Prieto con la menor V.R.O. en el Hospital Pediátrico Universitario.

 Esta fue la determinación del tribunal de apelativo, a pesar de que la sentencia del tribunal de instancia debió entenderse que tenía efectos sólo en cuanto a las acciones realizadas por el doctor en el Hospital Pediátrico Universitario, según se desprende de la minuta de 22 de mayo de 2001. El juez Negroni Cintrón disintió por entender que la responsabilidad o la inmunidad del doctor Vigo Prieto no podía ser adjudicada sumariamente.

 Véanse los escs. 7, 9 y 11.

 El texto conforme a la ley de 1986 está destacado con bastardillas en la cita del Art. 41.050 actual del Código Seguros de Puerto Rico, 26 L.P.R.A. see. 4105, transcrita en esta opinión, págs. 858-859.

 En la Exposición de Motivos de la Ley Núm. 98 de 24 de agosto de 1994 (1994 Leyes de Puerto Rico 494, 495) los legisladores expusieron:
“La exposición económica ilimitada de la Universidad se torna en extremo onerosa, si consideramos que, a tenor con lo dispuesto en el Artículo 41.050, ningún profesional de servicios de salud podrá ser incluido como parte demandada en una acción civil de reclamación de daños por impericia profesional, mientras actúe en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios. Tal disposición expone a la Universidad de Puerto Rico a tener que responder en forma ilimitada por los daños que ocasionen sus empleados inmunizados cuando cometen actos de impericia profesional médico-hospitalaria (malpractice) en el descargo de sus funciones. Idéntica responsabilidad y por los mismos motivos se le impone al Estado Libre Asociado de Puerto Rico, excepto que, en atención a los dispuesto en la Ley Núm. 104 de 29 de junio de 1995, según enmendada, la responsabilidad del Estado Libre Asociado de Puerto Rico se limitó hasta la suma de setenta y cinco mil dólares ($75,000.00) por los daños sufridos por una persona o su propiedad y hasta ciento cincuenta mil dólares ($150,000.00) cuando los daños y perjuicios se le causaron a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado.
“Es justo y conveniente para el interés público extenderle a la Universidad de Puerto Rico la misma limitación de responsabilidad por daños resultantes de culpa o *864 negligencia que al presente existe para beneficio del Estado Libre Asociado de Puerto Rico, cuando la Universidad presta servicios mediante acuerdo con el Departamento de Salud del Estado Libre Asociado de Puerto Rico o en sustitución de dicho Departamento o cuando opera hospitales públicos.”

 El texto de esta enmienda está destacado con bastardillas más subrayado en la cita del actual Art. 41.050 del Código Seguros de Puerto Rico, supra, transcrita en esta opinión, pág. 859.

 En el informe de la Comisión de lo Jurídico para el P. de la C. 3592, que dio paso a la última enmienda que se le hizo al Art. 41.050 del Código de Seguros de Puerto Rico, supra, se señala, en el análisis de la medida, que:
“Actualmente, entre los médicos participantes de esta inmunidad podemos mencionar los que están contratados por el Hospital Universitario de Distrito (UDH), los empleados, miembros de la facultad, residentes o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico en el desempeño de sus tareas institucionales, todas las profesiones de salud que se desempeñen en las facilidades médico hospitalarias que estén bajo la tutela y administración del Estado Libre Asociado a través del Departamento de Salud y los profesionales de servicios de salud adscritos a la Administración de Servicios Médicos de Puerto Rico.” P. de la C. 3592, 14ta Asamblea Legislativa, 7ma Sesión Ordinaria, 22 de junio de 2004, pág. 16.

 El texto de esta enmienda se encuentra destacado con subrayado sencillo en el Art. 41.050 actual del Código Seguros de Puerto Rico, transcrito en esta opinión, pág. 9.

 La Exposición de Motivos de la Ley Núm. 228 de 24 de agosto de 2004 deja esto claro al señalar:
“No obstante, para poder reclutar profesionales de la salud que deseen practicar su profesión en las instalaciones propiedad del Estado Libre Asociado, sus instrumentalidades o municipios, entendemos necesario garantizarles la misma protección que recibirían si fuesen empleados del ELA bajo el esquema previo a la década de los 1990. Por ello, debe extendérsele la inmunidad contenida en el Artículo 41.050 del Código de Seguros.
“Junto a la presente Ley y mediante legislación separada, se enmendará la Ley Núm. 104, supra, para disponer que el Estado Libre Asociado será responsable por reclamaciones contra profesionales de la salud por impericia médico-hospitalaria por los límites dispuestos en dicha ley cuando estos rindieron sus servicios en las áreas de obstetricia, ortopedia, cirugía general y trauma exclusivamente en instalaciones de salud propiedad del Estado Libre Asociado, sus instrumentalidades o municipios.”
En el informe de la Comisión de lo Jurídico para el P. de la C. 3592, supra, págs. 16-17, que dio paso a la la Ley Núm. 228, supra, se señala en el análisis de la medida que:
“Los médicos que son empleados de una administración privada no pueden ser considerados empleados, funcionarios o agentes del Estado Libre Asociado, por lo que no les aplica la inmunidad establecida en el Artículo 41.050. La contratación en este escenario es entre personas particulares: médicos y administración privada. Por esta *867 razón, aún [sic] cuando el Estado Libre Asociado o sus municipios recuperen la posesión de facilidades que en un momento fueron vendidas a entidades privadas, de contratar el ELA o sus municipios con entidades privadas para la administración de las facilidades, los médicos que prestan sus servicios en dichas facilidades vienen obligados a cumplir con la responsabilidad financiera que requiere el Artículo 41.050, y son responsables por los daños y perjuicios causados por impericia médica.
“La situación descrita en el párrafo anterior ha resultado en que muchos médicos que previo a la Reforma de Salud prestaban sus servicios exclusivamente en facilidades gubernamentales y estaban cobijados por la inmunidad del estado, se han convertido en empleados o contratistas de privatizadores. Ello los ha obligado a obtener pólizas de seguros de impericia médica y estar sujetos a responsabilidad por impericia médica como cualquier otro médico privado. Esto a su vez ha causado que muchos de estos médicos se rehúsen a prestar sus servicios en facilidades recuperadas por el estado o los municipios, ya que los costos de las pólizas de impericia médica y los riesgos asumidos al brindar servicios en facilidades gubernamentales no son razonables ante los salarios que dichas facilidades pueden pagar. Ante esto, hemos visto una reducción significativa en la disponibilidad de servicios médicos en las facilidades del estado y los municipios, particularmente en las áreas de obstetricia, ortopedia, cirugía general y trauma. Esta Asamblea Legislativa considera que las enmiendas propuestas en el P. de la C. 3592 ayudarán a aliviar la situación presente, y proveerán incentivos para que puedan brindarse nuevamente servicios de salud en las áreas antes mencionadas.
“Es necesario aclarar además que la presente enmienda no tiene el propósito ni el efecto de convertir a los médicos que brindan sus servicios como empleados o contratistas de entidades privadas que contratan la administración de facilidades propiedad de entidades gubernamentales en empleados ni agentes del Estado Libre Asociado ni de sus municipios. Finalmente, se aclara que, en el caso de acuerdos de afiliación entre la Universidad de Puerto Rico e instituciones privadas sin fines de lucro, no se exime de responsabilidad por impericia médica a dichas instituciones privadas cuando el alegado acto de impericia médica es cometido por empleados o agentes que no estén exentos en virtud del Artículo enmendado.”

 Estos son: (1) la forma en que los servicios fueron pagados; (2) la inversión en equipo científico y en facilidades o el grado de dependencia en el equipo suministrado por el Gobierno, y (3) si se le requiere un seguro de responsabilidad profesional.

 Apéndice, pág. 295.

 Antes de que se enmendara la Ley de la Universidad de Puerto Rico para permitir que la Universidad creara los PPMIU y que el Recinto creara las Normas y Procedimientos del Plan de Práctica Intramural del Recinto Ciencias Médicas, el Recinto de Ciencias Médicas tenía un reglamento para regular los Planes Intramurales de Práctica Médica, un sistema muy parecido al de los PPMIU. En conformidad con ese reglamento, el Recinto les proveía a los médicos un seguro médico.