RAFAEL FLORES ROMÁN, ETC., demandantes y recurrentes, *v.* JOSÉ RAMOS GONZÁLEZ, ETC., demandados y recurridos.

*Número:* RE-88-297 *Resuelto:* 18 de diciembre de 1990

---

(2) La querella del Procurador General fue presentada el 24 de agosto de 1990.

*Harry Anduze Montaño* y *Efraín Guzmán Mollet,* abogados de los recurrentes; *Fernando J. Fornaris* y *Ramón López Rivera,* de *Cancio, Nadal & Rivera,* abogados de Eric Carro y Rafael Rivera Pérez, recurridos; *Carlos J. Canggiano Román,* abogado de Eric Carro y la Corporación Insular de Seguros, recurridos; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, María Adaljisa Dávila* y *Sylvia Cancio Bigas, Procuradoras Generales Auxiliares,* abogados del Estado Libre Asociado.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Este recurso nos permite resolver si los médicos que trabajan para el Fondo del Seguro del Estado (en adelante el Fondo) bajo contrato están protegidos por la inmunidad conferida por el Art. 41.080 de la Ley Núm. 55 de 18 de julio de 1978, según enmendada, 26 L.P.R.A. sec. 4105. Ante nos los demandantes solicitan que revoquemos la determinación del Tribunal Superior de que los médicos contratados por el Fondo están cobijados por el estatuto. Evaluados los términos de la relación contractual entre las partes y el lenguaje de la ley, procede la revocación de la sentencia parcial recurrida.

I

La controversia de autos se origina en una demanda incoada por el peticionario el 28 de noviembre de 1984, Sr. Rafael Flores Román, contra los doctores Eric Carro y Rafael Rivera, el Administrador del Fondo del Seguro del Estado y varias aseguradoras. Se alegó que, como consecuencia de un accidente en el trabajo, el Fondo lo refirió a los doctores Carro y Rivera y que éstos brindaron un tratamiento equivocado al recurrente, lo que le causó una condición incurable que lo incapacitó permanentemente.

Los médicos demandados oportunamente levantaron, entre otras, la defensa afirmativa de disfrutar de la inmunidad conferida por el Art. 41.080 de la Ley Núm. 55, *supra*, según enmendada, porque suministraron el tratamiento médico en virtud de un contrato de servicios otorgado por el Fondo. Por su parte, Flores Román, mediante demanda enmendada de 10 de junio de 1985, objetó la aplicación de la defensa de inmunidad y cuestionó la constitucionalidad del estatuto, por violar la cláusula de igual protección de las leyes y de debido proceso de ley.

Luego de varios incidentes procesales, el foro de instancia concluyó que el tratamiento ofrecido fue en virtud de un contrato con el Fondo, y que como el servicio fue rendido en beneficio de

esa entidad la "inmunidad que concede esa disposición de Ley es aplicable también cuando se prestan servicios por médicos que no son empleados del Estado . . .". Apéndice, pág. 128. Además, a base de lo resuelto por este Tribunal en *Vázquez Negrón v. E.L.A.*, 109 D.P.R. 19 (1979), y en *Lind Rodríguez v. E.L.A.*, 112 D.P.R. 67 (1982), el tribunal sostuvo la constitucionalidad de la ley en controversia.

Mediante solicitud de revisión, Flores Román solicita que revoquemos la sentencia parcial dictada porque los codemandados recurridos, por ser contratistas independientes, no están cobijados por la Ley Núm. 55, *supra*, según enmendada. En el recurso sostiene la comisión de dos (2) errores, a saber: (1) la conclusión de que los médicos recurridos están cobijados por el Art. 41.080 de la Ley Núm. 55, *supra*, según enmendada, y (2) la aplicación de un análisis de nexo racional al adjudicar la constitucionalidad del estatuto. En vista de que el recurso requería que interpretáramos si esta ley concedía inmunidad a los médicos contratados por el Fondo y que esta controversia jurídica había sido objeto de diferentes interpretaciones por los tribunales de instancia, expedimos el auto de revisión. Con excepción de los médicos codemandados, todas las partes involucradas comparecieron y el recurso quedó oportunamente sometido para la resolución en sus méritos.

## II

■ Al interpretar el texto de la Ley Núm. 74 de 30 de mayo de 1976, según enmendada por la Ley Núm. 55, *supra*,(1) partimos

---

(1) Actualmente está codificado en 26 L.P.R.A. sec. 4105. La parte pertinente de dicha sección dispone:

"Ningún profesional de servicios de salud podrá ser incluido como parte demandada en una acción civil de reclamación de daños por culpa o negligencia por impericia profesional (*malpractice*) que cause en el desempeño de su profesión mientras dicho profesional de servicios de salud actúe en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios."

Para fines de la resolución de esta controversia, utilizaremos el texto de la ley que existía al momento de los hechos.

de la premisa que el estatuto estableció un programa de responsabilidad profesional médico-hospitalaria "con el propósito de ofrecer a la comunidad que recibe servicios de salud una protección social contra los daños y perjuicios por culpa o negligencia por impericia profesional". Exposición de Motivos de la Ley Núm. 6 de 30 de diciembre de 1986 (1986 Leyes de Puerto Rico 793). Con esta perspectiva, al interpretar su texto en circunstancias en que esté presente una condición que limite el derecho de los perjudicados a solicitar indemnización, en correcta hermenéutica jurídica esta disposición debe examinarse restrictivamente. *Vázquez Negrón v. E.L.A.*, supra, pág. 25; *Insurance Co. of P.R. v. Ruiz*, 96 D.P.R. 175, 179 (1968).

 En el caso particular del Art. 41.080 de la Ley Núm. 55, según enmendada, su texto es claro y preciso. Mediante esta disposición, la Asamblea Legislativa confirió inmunidad a los médicos por los daños causados por la negligencia en el desempeño de su profesión "mientras dicho profesional en el cuidado de salud actúe en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios". 1978 Leyes de Puerto Rico 574. Por lo tanto, para ser acreedor a la inmunidad deberá reunir los requisitos siguientes: (1) tiene que ser un profesional en el cuidado de la salud; (2) los daños ocasionados por su impericia tienen que haber sido causados en el desempeño de su profesión, y (3) tiene que haber actuado en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios.

 En *Lind Rodríguez v. E.L.A.*, supra, y en *Vázquez Negrón v. E.L.A.*, supra, validamos esta disposición frente a unos ataques constitucionales fundados en la cláusula de igual protección de las leyes y del debido procedimiento de ley, y definimos el alcance de la inmunidad concedida por el estatuto: "El Art. 41.080 del Código de Seguros exime de responsabilidad no sólo a los médicos que trabajan exclusivamente para el Estado, sino también a los que, como en este caso, en adición ejercen práctica

privada, mientras actúen en el cumplimiento de su deber como *empleados* del Estado." *Lind Rodríguez v. E.L.A.*, supra, pág. 68. Como en ese caso el médico demandado era empleado del Estado y, además, ejercía privadamente la medicina, sostuvimos que tenía inmunidad absoluta "por los actos torticeros que realicen durante tales gestiones". Íd., pág. 69.

Del propio estatuto se desprende que su protección cubre a los médicos que ocupen puestos de carrera o de confianza en el Estado Libre Asociado, sus dependencias o instrumentalidades, incluso al Fondo del Seguro del Estado,[2] siempre que el daño fuese ocasionado en el desempeño de sus funciones profesionales como empleados de esa entidad gubernamental. El estatuto también "exime de responsabilidad no sólo a los médicos que trabajan exclusivamente para el Estado, sino también a los que . . . en adición ejercen práctica privada, mientras actúen en el cumplimiento de su deber como empleados del Estado". (Énfasis suplido.) *Lind Rodríguez v. E.L.A.*, supra, pág. 68.

### III

Sin embargo, en lo que respecta al personal bajo contrato, hay que determinar si, al causar el daño, dicho profesional ejercía las funciones de un empleado de la agencia y en realidad tenía las responsabilidades asignadas a un puesto dentro de la estructura organizativa, o si el grado de control ejercido por el patrono sobre su trabajo era análogo al de un empleado.

---

[2] La Ley de Personal del Servicio Público de Puerto Rico (Ley de Personal) establece solamente dos (2) categorías de empleados públicos: de confianza y de carrera. 3 L.P.R.A. sec. 1349. Aunque la Sec. 10.6 excluye de su aplicabilidad a los empleados de agencias e instrumentalidades del Gobierno que tienen derecho a negociar colectivamente, 3 L.P.R.A. sec. 1338(4), el estatuto requiere que estas entidades aprueben reglamentos que incorporen el principio de mérito para el personal no cubierto por un convenio colectivo. 3 L.P.R.A. sec. 1331. Al amparo de esta ley, el Fondo del Seguro del Estado (el Fondo) adoptó un reglamento de personal que clasifica a los empleados en dos (2) categorías análogas a la Ley de Personal y creó los puestos correspondientes en todas sus divisiones. Véase Reglamento de Personal del Fondo del Seguro del Estado de 1ro de marzo de 1983, págs. 10–13.

La norma general en materia de contratación en la Rama Ejecutiva ha sido consistentemente que "un contrato en base al cual se requieran determinados servicios de una persona no genera un empleo en el Gobierno del Estado Libre Asociado". (Énfasis suprimido.) Op. Sec. Just. Núm. 1974-7 de 8 de marzo de 1974, pág. 35. No obstante, "cada contrato debe ser considerado separadamente para determinar si de acuerdo con los términos del mismo sólo existe una relación contractual entre la agencia y la persona o si, por el contrario, se desprende que en realidad la persona ocupa un empleo en la agencia o instrumentalidad de que se trate". Íd. Con estos propósitos hay que examinar la forma, el modo y las condiciones en que se presten los servicios, con énfasis particular en si los deberes y las responsabilidades requeridos corresponden a un puesto que requiera el empleo de una persona en forma regular a tiempo completo o parcial.[3] También debe examinarse si el contrato concede unos derechos y unas prerrogativas que, de ordinario, corresponden a un puesto regular, tales como licencia de vacaciones, licencia por enfermedad y participación en el sistema de retiro de los empleados públicos.

Por otro lado, debe también examinarse si las relaciones entre las partes de un contrato de servicios son de patronos y empleados o de principal y contratista independiente. El criterio rector debe ser la naturaleza, extensión y grado de control que se reserva el principal sobre la ejecución del trabajo:

Independientemente de si se ejercita o no, lo importante es la existencia del derecho o la autoridad para intervenir o controlar, que convertirá la otra persona en empleado y no en contratista independiente, al igual que es importante determinar si las instrucciones dadas tendrían que ser obedecidas. Ese mismo control puede ser ejercitado en distintas formas, y la relación entre las partes se podría determinar por la forma en que se ejercite ese control a la luz

---

[3] El Art. 12 del Reglamento de Personal de la Oficina Central de la Administración de Personal: Áreas Esenciales al Principio de Mérito, pág. 118, define "puesto" como "un conjunto de deberes y responsabilidades asignadas o delegadas por la autoridad nominadora que requieren el empleo de una persona durante la jornada completa o durante una jornada parcial".

de las circunstancias de cada caso. Si se controlan los medios y la manera de hacer el trabajo, la persona a cargo de la labor sería un empleado y surgiría la relación de contratista independiente cuando la persona que haga el trabajo está sometida a la voluntad del patrono solamente en cuanto al resultado pero no en cuanto a los medios y manera de cumplimentarlo. *Mariani v. Christy*, 73 D.P.R. 782, 798 (1952). Véanse: *Pérez v. Hato Rey Bldg. Co.*, 100 D.P.R. 882 (1972); *Barrientos v. Gob. de la Capital*, 97 D.P.R. 552, 561 (1969); *Landrón v. J.R.T.*, 87 D.P.R. 94 (1963); *Sierra Bedecía v. Pedro A. Pizá, Inc.*, 86 D.P.R. 447 (1962).

■ En el caso particular de los médicos se debe considerar la forma de pago por los servicios rendidos; la inversión en que se incurrió en equipo científico y en facilidades o el grado de dependencia en el equipo suministrado por el principal; si se le requiere un seguro de responsabilidad profesional, y el grado de juicio independiente que se requiera al suministrar sus servicios. Véase, también, R. Delgado Zayas, *Manual informativo de legislación protectora del trabajo de Puerto Rico*, San Juan, [s. ed.], 1989, pág. 73.

■ Para precisar la naturaleza de la relación y determinar si está cubierta por la inmunidad concedida por ley, es necesario considerar el conjunto de circunstancias en cada caso. Como la ley no cobija al profesional de la salud que tiene una relación de contratista independiente con el Estado, al surgir una controversia sobre la naturaleza del vínculo contractual procede un análisis de los hechos particulares de cada caso.

## IV

La prueba aducida en este caso establece que los médicos codemandados atienden a pacientes en virtud de unos contratos otorgados por el Fondo para la prestación de servicios por especialistas por el término de un (1) año. Mediante estos contratos, tanto el Dr. Eric Carro, neurocirujano, como el Dr. Rafael Rivera Pérez, siquiatra, se comprometieron a evaluar y a ofrecer tratamiento ambulatorio a los pacientes referidos por el

Fondo a cambio de una retribución por servicio rendido. Esencialmente, al amparo de este contrato, el Fondo refirió a estos especialistas unos obreros para que los atendieran como pacientes privados en el consultorio de cada uno. Además, en sus respectivos consultorios cada uno de ellos atendía a sus otros pacientes privados.

De un análisis de los contratos no aparece que el Fondo podía intervenir o controlar los medios y manera en que los médicos ofrecían sus servicios. En todo momento los médicos codemandados tenían la responsabilidad exclusiva sobre tanto la fase del diagnóstico como el tratamiento de los obreros.

En vista de que los médicos tenían control absoluto sobre el tipo y la calidad del tratamiento ofrecido a todos sus pacientes, el contrato requirió que cada uno de ellos se comprometiese a "mantener vigentes en todo momento Pólizas de Responsabilidad Pública e Impericia Médica ('Malpractice') y a [someter prueba sobre] la existencia de las mismas a requerimiento de EL FONDO". Apéndice de la solicitud de revisión, pág. 139. Simultáneamente, cada uno relevó al "FONDO de toda responsabilidad por reclamaciones que surjan debido a actos u omisiones bajo su supervisión y control y se compromete a reembolsar a EL FONDO los gastos legales en que éste incurra en toda acción legal de esta índole donde se le reclame responsabilidad a EL FONDO". Íd.

De esta manera ambas partes ratificaron que su intención era que los médicos tuvieran una póliza de responsabilidad pública e impericia profesional para cubrir cualquier daño causado a todos sus pacientes, incluso a los obreros referidos por el Fondo, y a eximir al Estado de responsabilidad por sus actuaciones mientras ejercían privadamente la profesión.

Congruentemente con este esquema de referimiento de obreros compensados por el Fondo, los médicos contratados tenían la responsabilidad de contratar y supervisar a su personal técnico y administrativo, y a cubrir los gastos básicos de alquiler, agua, electricidad y teléfono. También correspondía a ellos comprar el

equipo, los materiales y los medicamentos que necesitan para rendir eficientemente sus servicios profesionales.

Por otro lado, un análisis de los términos de los contratos tampoco revela que los médicos codemandados ejercieran las funciones regulares de un empleado del Fondo. En primer lugar, ambos atendían a los pacientes en su consultorio privado y no en las facilidades del Fondo. La compensación de ambos era por servicio rendido o por paciente atendido de acuerdo con un esquema tarifario establecido para los especialistas con este tipo de contrato. Tampoco se les concedió ninguno de los beneficios marginales que tenían los empleados del Fondo ni se les retuvo contribuciones sobre ingresos.

Finalmente, los contratos podrían ser rescindidos por cualquiera de las partes contratantes previa notificación por escrito con no menos de treinta (30) días de antelación.

■ En estas circunstancias, concluimos que la relación contractual establecida entre ellos y el Fondo fue la de unos "contratistas independientes" y, por lo tanto, sus actuaciones no están cobijadas por la inmunidad concedida por la Ley Núm. 74, *supra,* según enmendada.

*Procede la revocación de la sentencia parcial recurrida y la devolución del caso al foro de instancia para la continuación de los procedimientos.*

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita. Los Jueces Asociados Señor Negrón García y Señora Naveira de Rodón no intervinieron.