EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Roberto Rodríguez Ruiz y Erica Ortiz Cancel, por sí y en representación de su hija menor V.R.O y la sociedad legal de ganaciales compuesta entre ambos<br><br>        Demandantes-peticionarios<br><br>                v.<br><br>Hospital San Jorge, Dr. Vigo y la sociedad legal de gananciales compuesta por éste y su esposa Jane Doe, et als<br><br>        Demandados-recurridos | Certiorari<br><br>2007 TSPR 5<br><br>169 DPR _____ |

Número del Caso: CC-2004-383

Fecha: 16 de enero de 2007

Tribunal de Apelaciones:

        Región Judicial de San Juan-Panel III

Juez Ponente:
        Hon. Jorge Segarra Olivero

Abogado de la Parte Peticionaria:

        Lcdo. Víctor A. García Rodon

Abogados de la Parte Recurrida:

        Lcda. Sigrid López González
        Lcdo. Pedro J. Landrau López
        Lcdo. José A. Miranda Daleccio

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Roberto Rodríguez Ruiz y Erica
Ortiz Cancel, por sí y en
representación de su hija menor
V.R.O. y la sociedad legal de
gananciales compuesta entre
ambos
   Demandantes-peticionarios

                             CC-2004-383   *Certiorari*

      v.

Hospital San Jorge, Dr. Vigo y
la sociedad legal de
gananciales compuesta por éste
y su esposa Jane Doe, et als
     Demandados-recurridos

Opinión del Tribunal emitida por la JUEZA ASOCIADA FIOL MATTA

En San Juan, Puerto Rico, a 16 de enero de 2007.

Debemos resolver si los doctores que participan del programa del Plan de Práctica Médica Intramural Universitaria (PPIU) del Recinto de Ciencias Médicas están protegidos por la inmunidad que otorga el artículo 41.50 del Código de Seguros de Puerto Rico, 26 L.P.R.A. § 4105 (Supl. 2005), a los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias e instrumentalidades. Por las razones que exponemos a continuación, resolvemos que sí.

I

Los peticionarios, el señor Roberto Rodríguez Ruiz y la señora Erica Ortiz Cancel presentaron, por sí y en representación de la sociedad legal de

bienes gananciales compuesta entre ambos y de su hija menor Vilmary Rodríguez Ortiz, una demanda sobre daños y perjuicios por impericia médica contra el Hospital San Jorge, el doctor Juan A. Vigo Prieto y la sociedad legal de bienes gananciales que éste compone junto a su esposa, el Centro Médico de Puerto Rico, el Hospital Pediátrico Universitario, la Universidad de Puerto Rico, y sus respectivas aseguradoras. En la demanda, los peticionarios expusieron que su hija, paciente de hidrocefalia desde su nacimiento, fue atendida y operada en el Hospital San Jorge de apendicitis; que luego de ser dada de alta tuvo que ser llevada nuevamente al hospital en donde se le diagnosticó encefalitis ocasionada por una infección. Alegan que el caso de su hija le fue referido en el Hospital San Jorge al doctor Vigo Prieto para una consulta, y que a instancias de éste la niña fue trasladada al Hospital Pediátrico Universitario. Según la demanda, la menor tuvo que esperar tres días en el Hospital Pediátrico Universitario para ser atendida adecuadamente. Luego de esos tres días, la menor fue operada por el doctor Vigo Prieto.

Para la fecha de los hechos, el doctor Vigo Prieto era catedrático auxiliar de la Universidad de Puerto Rico del Recinto de Ciencias Médicas. Participaba también del programa del Plan de Práctica Médica Intramural (PPIU) del Recinto a través del grupo de neurocirugía,[1] Además, tenía

---

[1] Mediante estos programas la facultad y el personal administrativo del Recinto de Ciencias Médicas se organiza en grupos para ofrecer servicios médicos utilizando las facilidades del Recinto. Las ganancias que resultan de este esfuerzo se dividen entre el Recinto y el personal docente y administrativo que participa del programa. El propósito primordial es ofrecerle un incentivo económico al personal docente para que no abandone la cátedra por la

una oficina en el Hospital San Jorge y privilegios para operar en este hospital. Los peticionarios alegan que la atención tardía del doctor Vigo Prieto y el traslado de la niña al Hospital Universitario cuando podía atenderse en el Hospital San Jorge causaron que ésta sufriera daños físicos y cerebrales que no padecía anteriormente y que la afectarán durante toda su vida. Por ello solicitan que el doctor los indemnice. El doctor Vigo contestó la demanda; negó esencialmente las alegaciones, y levantó, en lo pertinente y como defensa afirmativa, que atendió a la menor Vilmary Rodríguez en el Hospital Pediátrico Universitario como empleado de la Universidad de Puerto Rico a través del grupo de neurocirugía del PPIU del Recinto de Ciencias Médicas y que en ningún momento intervino con la menor cuando ésta visitó el Hospital San Jorge.

Luego de esto, el doctor Vigo Prieto presentó una moción de sentencia sumaria en la que solicitó que se desestimara la demanda instada en su contra ya que él estaba cobijado por la inmunidad otorgada por el Artículo 41.50 del Código de Seguros de Puerto Rico, 26 L.P.R.A. § 4105 (Supl. 2005), a los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias e instrumentalidades. Los peticionarios se opusieron a la solicitud de sentencia sumaria. Argumentaron, en primer lugar, que las alegaciones de la demanda en contra del doctor Vigo fueron en su carácter como médico del Hospital San Jorge. También expresaron su interés en conocer el

práctica privada de la Medicina. Para una discusión más profunda sobre los PPIU véase la sección IV de esta opinión.

tipo de relación contractual que mantenían el doctor y la Universidad de Puerto Rico. Por último, solicitaron que antes de resolver la moción de sentencia sumaria, se finalizara el descubrimiento de prueba de modo que se pudiera aclarar la relación del doctor Vigo Prieto con el Hospital San Jorge y con la Universidad de Puerto Rico, y cuál fue su intervención con la paciente en el Hospital San Jorge. En esencia, los peticionarios plantearon que existía controversia de hechos y que era necesario ordenar al doctor Vigo y a la Universidad de Puerto Rico a que produjeran ciertos documentos que permitieran evaluar si el doctor estaba protegido por la norma de inmunidad.[2]

En septiembre de 2001, el doctor Vigo Prieto presentó nuevamente una moción de sentencia sumaria. En noviembre de ese año, se celebró una vista en la cual se discutió la solicitud de sentencia sumaria. Luego de la vista, el tribunal de instancia le concedió un término adicional a las partes para que finalizaran el descubrimiento de prueba. Las controversias en cuanto al descubrimiento de

---

[2] En específico los peticionarios deseaban que el el Tribunal le ordenara a los demandados entregarle copia de los siguientes documentos: deposición tomada al doctor Vigo el 29 de agosto de 2001; informe de consulta del Hospital San Jorge del 22 de julio de 1997 en el cual alegadamente hay una anotación que indica que se le dirigió una consulta al doctor Vigo sobre la menor Vilmary Rodríguez Ortiz a las 3:50 pm; historial de pagos hechos por Triple S por servicios prestados para el tratamiento de la niña Vilmary Rodríguez; Normas y Procedimientos del Plan de Práctica Intramural Universitaria; Plan de Práctica Intramural Universitaria; Normas Provisionales Complementarias Especiales al Reglamento para la Creación y Administración de Planes de Práctica Intramural para el Recinto de Ciencias Médicas de la Universidad de Puerto Rico; Certificación Núm. 124 del período de 1996-1997 aprobada por la Junta de Síndicos de la Universidad de Puerto Rico con el propósito de incluir en el Reglamento General de la Universidad las disposiciones relacionadas con la creación del Plan de Práctica Universitaria Intramural.

prueba continuaron hasta que el Tribunal de Primera Instancia dictó sentencia sumaria parcial en septiembre de 2002.[3] En ésta, desestimó la demanda en cuanto al doctor Vigo Prieto, según había resuelto "en corte abierta" el 22 de mayo de 2001.[4]

Inconforme con ese dictamen, los peticionarios acudieron ante el entonces Tribunal de Circuito de Apelaciones. Los peticionarios entendían que se había equivocado el Tribunal de Primera Instancia al resolver que al doctor Vigo Prieto le cobijaba la inmunidad de los médicos empleados por el Estado, porque existía una controversia real de hechos sobre si éste había incurrido

---

[3] El 17 de enero de 2002, los apelantes solicitaron nuevamente que se le ordenara a la Universidad de Puerto Rico a que produjera ciertos documentos. El 17 de abril de 2002, la Universidad de Puerto Rico presentó una moción en la que informó que le había enviado a los apelantes los documentos solicitados. El 26 de junio de 2002, en la conferencia con antelación al juicio las partes argumentaron sus posiciones. Además, los peticionarios solicitaron que se les permitiera descubrir prueba en torno a las gestiones del doctor Vigo Prieto en el Hospital San Jorge. Luego de la conferencia con antelación al juicio, el tribunal dispuso que se dejaba sometida la moción del doctor Vigo Prieto en la cual se solicitaba se dictara sentencia sumaria parcial e igualmente el asunto sobre la necesidad de la información que solicitaron los peticionarios.

El 19 de agosto de 2002, los peticionarios se opusieron nuevamente a que se dictara sentencia sumaria a favor del doctor Vigo Prieto y solicitaron que no se dictara sentencia hasta tanto se finalizara el descubrimiento de prueba relacionado con: las operaciones realizadas por el doctor Vigo Prieto en el Hospital San Jorge y todo el expediente de facturación de dicho médico, y con el historial de facturación de los planes médicos Triple S y GA Life correspondiente a la paciente Vilmary Rodríguez. Los peticonarios señalaron, además, que interesaban tomarle una deposición al funcionario de la Universidad de Puerto Rico encargado de todo lo relacionado con el Plan de Práctica Intramural.

[4] De la minuta del 22 de mayo de 2001 se desprende que el Tribunal de Primera Instancia declaró con lugar la solicitud de sentencia sumaria en cuanto a la intervención del doctor Vigo Prieto con la menor Vilamry Rodríguez en el Hospital Pediátrico.

en actos u omisiones negligentes como médico del Hospital San Jorge y si el galeno había actuado como contratista independiente o como empleado del Hospital Universitario.

El foro apelativo confirmó la sentencia en cuanto a la inmunidad del doctor Vigo Prieto en su práctica en el Hospital Pediátrico Universitario y la revocó en cuanto a su práctica en el Hospital San Jorge. Entendió que la sentencia de instancia se extendía a las reclamaciones fundamentadas en la relación del doctor Vigo Prieto con ese hospital,[5] Los peticionarios acuden ante nosotros y nos señalan que el Tribunal de Apelaciones erró al confirmar al Tribunal de Primera Instancia en cuanto a la extensión de la inmunidad del artículo 41.50 al doctor Vigo Prieto por sus actuaciones en Hospital Pediátrico Universitario, cuando existe una controversia de hechos sobre si al atender a la menor a través del PPIU de neurocirugía éste lo hizo como contratista independiente o como empleado de dicho hospital.

Por tanto, debemos resolver si el doctor Vigo Prieto estaba protegido, mientras atendió a la menor como parte del grupo de neurocirugía del programa del PPIU del Recinto de Ciencias Médicas, por la inmunidad que otorga el artículo 41.50 del Código de Seguros de Puerto Rico, *supra*, a los médicos que son empleados del Estado Libre Asociado de Puerto Rico. Además, debemos resolver si en efecto el tribunal de primera instancia adjudicó la

---

[5] Esta fue la determinación del Tribunal de Apelaciones, a pesar de que la sentencia del tribunal de instancia debió entenderse que tenía efectos sólo en cuanto a las acciones realizadas por el doctor en el Hospital Pedriático Universitario, según se desprende de la minuta del 22 de mayo de 2001. El juez Negroni Cintrón disintió por entender que la responsabilidad o la inmunidad del doctor Vigo Prieto no podía ser adjudicada sumariamente.

posible responsabilidad del doctor Vigo Prieto en cuanto al tratamiento de la menor en el Hospital San Jorge y su traslado al Hospital Universitario y, de ser así, si procede adjudicar en torno a dicha responsabilidad de manera sumaria en esta etapa del procedimiento.

II

En Puerto Rico hemos reconocido desde hace más de cinco décadas que los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias e instrumentalidades gozan de inmunidad en pleitos de impericia profesional relacionados con el desempeño de su labor. Véase Ley núm. 74 del 30 de mayo de 1976; Lind Rodríguez v. E.L.A., 112 D.P.R. 67 (1982); Flores Román v. Ramos González, 127 D.P.R. 601 (1990); Art. 41.50 Cód. Seg. P.R., 26 L.P.R.A. § 4105 (Supl. 2005). Curiosamente, esta protección se encuentra regulada en el Código de Seguros de Puerto Rico y no el Código Civil dentro del capítulo sobre las obligaciones que nacen de la culpa o la negligencia. El legislador decidió colocar esta protección en el mismo artículo que pretende garantizar que la población puertorriqueña esté protegida en los casos de impericia médica al exigirle a los médicos que posean un seguro de responsabilidad profesional. Véase Exposición de Motivos de la Ley núm. 4 del 30 de diciembre de 1980. En la actualidad, este artículo del Código de Seguros provee, en lo pertinente, lo siguiente:

> Todo profesional de servicios de salud e institución de cuidado de salud deberá radicar anualmente prueba de su responsabilidad financiera por la cantidad de cien mil (100,000) dólares por incidente o hasta un agregado de trescientos mil (300,000) dólares por año. El Comisionado podrá requerir límites hasta un máximo de quinientos mil (500,000) dólares por incidente médico y un agregado de

un millón (1,000,000) de dólares por año, en los casos de instituciones de cuidado de salud y de aquellas clasificaciones tarifarias de profesionales de servicios de salud dedicados a la práctica de especialidades de alto riesgo…. *Están exentos de esta obligación aquellos profesionales de servicios de salud que no ejercen privadamente su profesión y trabajan exclusivamente como empleados de instituciones de cuidado de salud privadas, siempre y cuando estuvieren cubiertos por la prueba de responsabilidad financiera de éstas.* ***También están exentos de esta obligación los profesionales de servicios de salud que presten servicios exclusivamente como empleados o contratistas del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios y que no ejercen privadamente su profesión.*** *Están exentas además las instituciones de cuidado de salud que pertenezcan y sean operadas o administradas por el Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios.*

. . . .

*Ningún profesional de servicios de salud podrá ser incluido como parte demandada en una acción civil de reclamación de daños por culpa o negligencia por impericia profesional (malpractice) que cause en el desempeño de su profesión mientras dicho profesional de servicios de salud actúe en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades,* El Centro Comprensivo de Cáncer de la Universidad de Puerto Rico *y municipios* o contratistas de éstos, *mientras actúe en cumplimiento de sus deberes y funciones en las áreas de obstetricia, ortopedia, cirugía general o trauma en una instalación médico-hospitalaria propiedad del Estado Libre Asociado, sus dependencias, instrumentalidades y/o municipios, independientemente de si dicha instalación está siendo administrada u operada por una entidad privada.*

En toda acción civil en que se le reclamen daños y perjuicios a la Universidad de Puerto Rico; en todo caso en que recaiga sentencia por actos constitutivos de impericia médico-hospitalaria (malpractíce) que cometan los empleados, miembros de la facultad, residentes, o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico en el desempeño de sus tareas institucionales; o cuando recaiga sentencia por actos constitutivos de culpa o negligencia directamente relacionada con la operación por la Universidad de Puerto Rico de una institución de cuidado de la salud, se sujetará a la Universidad de Puerto Rico a los

> límites de responsabilidad y condiciones que las secs. 3077 et seq. del Título 32, impone para exigirle responsabilidad al Estado Libre Asociado de Puerto Rico en similares circunstancias.
>
> . . .
>
> Art. 41.50 Cód. Seg. P.R., *supra*.[6]

Nuestra última expresión sobre este artículo en cuanto a la inmunidad de los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios fue en el caso de Flores Román v. Ramos González, *supra*. En ese caso reiteramos la norma que esbozáramos originalmente en el caso de Lind Rodríguez v. E.L.A., 112 D.P.R. 67 (1982), de que este artículo del Código de Seguros exime de responsabilidad no sólo a los médicos que trabajan exclusivamente para el Estado, sino también a los médicos que al mismo tiempo ejercen la práctica privada mientras actúan en el cumplimiento de su deber como empleados del Estado. Establecimos entonces que para ser protegido por la inmunidad estatutaria se debe ser un profesional en el cuidado de la salud y los daños ocasionados por su impericia deben haber surgido mientras actuaba en cumplimiento de sus deberes y funciones profesionales como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios. Flores Román v. Ramos González, *supra* en la pág. 606.

Asimismo, determinamos que la inmunidad, además de proteger a los médicos que ocupan puestos de carrera o de confianza en el gobierno del E.L.A., puede cobijar a médicos que tengan contratos con el gobierno. En cuanto

---

[6] Énfasis suplido. Véanse notas 7, 9, 11.

al personal bajo contrato establecimos que hay que determinar si al causar el daño el médico cumplía las funciones de un empleado de la agencia y tenía en realidad las responsabilidades asignadas a un puesto dentro de la estructura organizativa o si el grado de control ejercido por el patrono sobre su trabajo era análogo al de un empleado. Establecimos que estos médicos están cobijados por la inmunidad si luego de analizar ciertos factores se determina que la relación del médico con el gobierno no es de contratista independiente. Los factores a considerar para saber si alguien es contratista independiente del gobierno son los siguientes: 1. la forma en que los servicios fueron pagados; 2. la inversión en equipo científico y en facilidades o el grado de dependencia en el equipo suministrado por el gobierno; 3. si se le requiere un seguro de responsabilidad profesional; y 4. el grado de independencia en su juicio profesional. Flores Román v. Ramos González, *supra*, en la pág. 609. En cuanto al factor de grado de independencia en su juicio profesional, es incuestionable que para que los médicos ejerzan su labor adecuadamente deben tener el mayor grado de independencia. Por tanto, este factor no es importante cuando se trata de profesionales de la salud, así que no debe ser considerado al momento de determinar si un médico está protegido por la inmunidad del artículo 41.50 del Código de Seguros, *supra*.

Lo anterior implica que cuando nos enfrentamos al caso de un médico que esté trabajando para el gobierno por contrato, es necesario determinar, en primer lugar, la naturaleza del vínculo contractual particular. De ello

dependerá si está cobijado por la inmunidad y, por consiguiente, si procede la desestimación de la demanda en su contra. Después de todo la inmunidad dispuesta por ley no es meramente una defensa; se trata más bien de la inexistencia de una causa de acción. Lind Rodríguez v. E.L.A., *supra* en la pág. 69.

Ahora bien, antes de evaluar la relación del doctor Vigo Prieto con el Recinto de Ciencias Médicas a la luz de los factores que mencionáramos debemos considerar si nuestras expresiones en Flores Román v. Ramos González, *supra*, continúan vigentes luego de las varias enmiendas que desde esa opinión ha sufrido el artículo 41.50 del Código de Seguros.

## III

La inmunidad que se recoge hoy en el artículo 41.50 fue incluida en el Código de Seguros de Puerto Rico por primera vez en 1976, cuando se añadió el Capítulo 41 al Código. Véase Ley núm. 74 del 30 de mayo de 1976. La norma se encontraba entonces en el artículo 41.80 que proveía, al igual que el 41.50 en la actualidad, esencialmente dos cosas. Primero, que los profesionales en el cuidado de la salud que no ejercían privadamente su profesión y prestaban servicios exclusivamente como empleados del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios estaban exentos de mostrar que tenían un seguro de responsabilidad. Art. 41.80 Ley núm. 74 del 30 de mayo de 1976. La ley proveía, en segundo lugar, que ningún profesional de servicios de la salud podía ser incluido como parte demandada en una acción civil de reclamación de daños por culpa o negligencia por impericia profesional por actos cometido en el desempeño

de su profesión mientras actuaba en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios. En otras palabras, estos profesionales no tenían que adquirir un seguro de responsabilidad, precisamente porque la ley eliminaba cualquier causa de acción en su contra.

Esta ley fue enmendada en 1978, pero la inmunidad de los médicos que son empleados del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios no fue alterada. Véase Ley núm. 55 del 18 de julio de 1978. En 1986, se redactó un nuevo Capítulo 41 del Código de Seguros y se derogó el anterior. Véase Ley núm. 4 del 30 de diciembre de 1986. Este nuevo capítulo también reconoció la inmunidad de los médicos empleados del E.L.A., al eximirles de la responsabilidad de presentar prueba de tener un seguro de responsabilidad y al disponer expresamente que no podían ser incluidos como parte demandada en una acción civil de reclamación de daños por culpa o negligencia por impericia médica. Además, la ley de 1986 incluyó, entre los que están exentos de presentar evidencia de tener seguro, a las instituciones de cuidado de salud que pertenezcan y sean operadas o administradas por el E.L.A. y a los médicos que trabajan exclusivamente con instituciones privadas si éstas los incluyen dentro de sus seguros de responsabilidad.[7] Sin embargo, aunque se les eximió de presentar prueba sobre el seguro de responsabilidad, no se

_____

[7] El texto bajo la ley de 1986 es lo destacado en bastardillas en el texto del artículo actual del artículo 41.50 del Código Seguros en las págs. 7-8.

les eximió de su responsabilidad. Por eso, ninguna de las instituciones o los médicos añadidos a la exención goza de inmunidad bajo el nuevo esquema del Código Seguros de 1986.

Esto no representaba problema para aquellos médicos en la práctica privada que trabajaran exclusivamente para instituciones privadas, quienes tendrían la cubierta del seguro de responsabilidad para casos de impericia que sus

patronos debían obtener a nombre suyo. No obstante, las instituciones de salud operadas o administradas por el E.L.A. seguían sujetas a pagar por los daños que fueran resultado de la impericia de los médicos u otras personas que trabajaran en sus facilidades.

En 1994, esta situación motivó a los legisladores a enmendar nuevamente la sección de responsabilidad financiera del Capítulo 41 del Código de Seguros. Surgió la preocupación de que la Universidad de Puerto Rico, que se entendía no estaba cobijada por los límites que impone la Ley 104 del 29 de junio de 1955, tuviera que responder por la totalidad de los daños que pudieran causar los galenos que trabajaban en sus facilidades, quienes, sin embargo, estaban inmunes a cualquier acción de daños.[8] La

---

[8] En la Exposición de Motivos de la Ley núm. 98 del 24 de agosto de 1994 los legisladores expusieron que:

La exposición económica ilimitada de la Universidad se torna en extremo onerosa, si consideramos que, a tenor con lo dispuesto en el Artículo 41.050, ningún profesional de servicios de salud podrá ser incluido como parte demandada en una acción civil de reclamación de daños por impericia profesional, mientras actúe en cumplimiento de sus deberes y funciones como empleado del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios. Tal disposición expone a la Universidad de Puerto Rico a tener que responder en forma ilimitada

Ley núm. 98 del 24 de agosto de 1994 sujeta a los límites de responsabilidad de la Ley 104 toda acción contra la Universidad de Puerto Rico por daños y perjuicios o impericia médico-hospitalaria de los empleados, miembros de la facultad, residentes, o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico, en el desempeño de sus tareas institucionales o por actos de culpa o negligencia relacionados con la operación de una institución de cuidado de la salud la Universidad.[9]

Esta enmienda no cambió la inmunidad de los médicos que trabajan para el Estado Libre Asociado, por lo cual nuestros pronunciamientos en Flores Román v. Ramos González, *supra*, siguieron vigentes. Es más, esta

---

por los daños que ocasionen sus empleados inmunizados cuando cometen actos de impericia profesional médico-hospitalaria (malpractice) en el descargo de sus funciones. Idéntica responsabilidad y por los mismos motivos se le impone al Estado Libre Asociado de Puerto Rico, excepto que, en atención a los dispuesto en la Ley Núm. 104 de 29 de junio de 1995, según enmendada, la responsabilidad del Estado Libre Asociado de Puerto Rico se limitó hasta la suma de setenta y cinco mil dólares ($75,000.00) por los daños sufridos por una persona o su propiedad y hasta ciento cincuenta mil dólares ($150,000.00) cuando los daños y perjuicios se le causaron a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado.

Es justo y conveniente para el interés público extenderle a la Universidad de Puerto Rico la misma limitación de responsabilidad por daños resultantes de culpa o negligencia que al presente existe para beneficio del Estado Libre Asociado de Puerto Rico, cuando la Universidad presta servicios mediante acuerdo con el Departamento de Salud del Estado Libre Asociado de Puerto Rico o en sustitución de dicho Departamento o cuando opera hospitales públicos.

enmienda recogió parte de nuestras expresiones en el caso de Flores Román v. Ramos González, *supra*, pues reconoció, entre las personas que pueden beneficiarse de la inmunidad, es decir, entre aquellos por cuya impericia respondería la Universidad de Puerto Rico, a los médicos bajo contrato con la Universidad dentro del límite que impone la Ley 104. Se impone esta interpretación de la enmienda ya que de otra forma habría que considerar a estos médicos como contratistas independientes. En ese caso, para que la Universidad respondiera sería necesario probar que ésta no

le requirió al médico que tomara las medidas de seguridad necesarias para su práctica o que no ejerció la debida diligencia en tomar estas medidas. Véase Bonet v. Municipio de Barcelonesa, 87 D.P.R. 81 (1963); Barrientos v. Gobierno de la Capital, 97 D.P.R. 552 (1969); López v. Cruz Ruiz, 131 D.P.R. 694 (1992); Pons Anca v. Engebretson, 2003 TSPR 150. Esta situación, en la cual la Universidad respondería por las acciones de sus contratistas independientes, está contemplada en el tercer escenario que vislumbra la enmienda de 1994, al establecer que la Universidad estará sujeta a los límites de la Ley 104 cuando recaiga sentencia por actos constitutivos de culpa o negligencia directamente relacionados con la operación por parte de ésta de una institución de cuidado de la salud.

Al mismo tiempo, la enmienda de 1994 arrojó luz sobre quiénes los legisladores consideran son los profesionales exentos de cumplir con el deber de evidenciar que poseen un seguro y quiénes están cobijados por la inmunidad por

---

[9] El texto de esta enmienda es lo destacado en doble subrayado en el texto del artículo actual del artículo 41.50 del Código Seguros en las págs. 7-8.

ser empleados del Estado Libre Asociado. Entre estos profesionales se encuentran los empleados, miembros de la facultad, residentes, o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico en el desempeño de sus tareas institucionales.[10]

Aunque la última enmienda que se le hizo al artículo 41.50 no trajo ningún cambio en cuanto al asunto que se nos plantea en este caso, sí introdujo cambios que inciden en las normas que expusiéramos en Flores Román v. Ramos González, *supra*. En el 2004, los legisladores preocupados por los efectos que trajo la privatización de la mayor parte de las facilidades de salud del gobierno y la posterior recuperación de algunas de éstas, enmendaron el artículo de responsabilidad financiera para otorgarle inmunidad en casos de impericia profesional a los profesionales que prestan ciertos servicios específicos. Según la enmienda, tienen inmunidad los especialistas en

---

[10] En el informe de la Comisión de lo Jurídico para el Proyecto de la Cámara 3592, que dio paso a la última enmienda que se le hizo al artículo 41.50 del Código de Seguros se señala en el análisis de la medida que:

> Actualmente, entre los médicos participantes de esta inmunidad podemos mencionar los que están contratados por el Hospital Universitario de Distrito (UDH), los empleados, miembros de la facultad, residentes o estudiantes del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, o médicos que presten servicios bajo contrato con la Universidad de Puerto Rico en el desempeño de sus tareas institucionales, todas las profesiones de salud que se desempeñen en las facilidades médico hospitalarias que estén bajo la tutela y administración del Estado Libre Asociado a través del Departamento de Salud y los profesionales de servicios de salud adscritos a la Administración de Servicios Médicos de Puerto Rico.

obstetricia, ortopedia, cirugía general y trauma que prestan servicios exclusivamente en instalaciones médico hospitalarias propiedad del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades o sus municipios, independientemente de si la institución es administrada u operada por alguna empresa privada.

Para lograr esto se hicieron dos cambios al artículo 41.50. El primero fue incluir entre los médicos exentos de presentar prueba de responsabilidad médica a los profesionales de la salud que trabajan como contratistas del Estado Libre Asociado. El segundo fue extender la inmunidad a los contratistas ya mencionados.[11] Estos profesionales son también los contratistas que están exentos de presentar la prueba de responsabilidad, en otras palabras, exentos de tener un seguro personal. Así lo evidencia la exposición de motivos de la ley y su historial legislativo.[12]

---

[11] El texto de esta enmienda es lo destacado en subrayado en el texto del artículo actual del artículo 41.50 del Código Seguros en las págs. 7-8.

[12] La Exposición de Motivos de la Ley núm. 228 del 24 de agosto de 2004 deja esto claro al señalar que:

> No obstante, para poder reclutar profesionales de la salud que deseen practicar su profesión en las instalaciones propiedad del Estado Libre Asociado, sus instrumentalidades o municipios, entendemos necesario garantizarles la misma protección que recibirían si fuesen empleados del ELA bajo el esquema previo a la década de los 1990. Por ello, debe extendérsele la inmunidad contenida en el Artículo 41.050 del Código de Seguros.

> Junto a la presente Ley y mediante legislación separada, se enmendará la Ley Núm. 104, supra, para disponer que el Estado Libre Asociado será responsable por reclamaciones contra profesionales de la salud por impericia médico-hospitalaria por los límites dispuestos en dicha ley cuando estos rindieron sus servicios en las áreas de obstetricia,

ortopedia, cirugía general y trauma exclusivamente en instalaciones de salud propiedad del Estado Libre Asociado, sus instrumentalidades o municipios.

En el informe de la Comisión de lo Jurídico para el Proyecto de la Cámara 3592, que dio paso a la la Ley núm. 228 del 24 de agosto de 2004 se señala en el análisis de la medida que:

Los médicos que son empleados de una administración privada no pueden ser considerados empleados, funcionarios o agentes del Estado Libre Asociado, por lo que no les aplica la inmunidad establecida en el Artículo 41.050. La contratación en este escenario es entre personas particulares: médicos y administración privada. Por esta razón, aún (sic) cuando el Estado Libre Asociado o sus municipios recuperen la posesión de facilidades que en un momento fueron vendidas a entidades privadas, de contratar el ELA o sus municipios con entidades privadas para la administración de las facilidades, los médicos que prestan sus servicios en dichas facilidades vienen obligados a cumplir con la responsabilidad financiera que requiere el Artículo 41.050, y son responsables por los daños y perjuicios causados por impericia médica.

La situación descrita en el párrafo anterior ha resultado en que muchos médicos que previo a la Reforma de Salud prestaban sus servicios exclusivamente en facilidades gubernamentales y estaban cobijados por la inmunidad del estado, se han convertido en empleados o contratistas de privatizadores. Ello los ha obligado a obtener pólizas de seguros de impericia médica y estar sujetos a responsabilidad por impericia médica como cualquier otro médico privado. Esto a su vez ha causado que muchos de estos médicos se rehúsen a prestar sus servicios en facilidades recuperadas por el estado o los municipios, ya que los costos de las pólizas de impericia médica y los riesgos asumidos al brindar servicios en facilidades gubernamentales no son razonables ante los salarios que dichas facilidades pueden pagar. Ante esto, hemos visto una reducción significativa en la disponibilidad de servicios médicos en las facilidades del estado y los municipios, particularmente en las áreas de obstetricia, ortopedia, cirugía general y trauma. Esta Asamblea Legislativa considera que las enmiendas propuestas en el P. de la C. 3592 ayudarán a aliviar la situación presente, y proveerán incentivos para que puedan brindarse nuevamente servicios de salud en las áreas antes mencionadas.

Esta enmienda resulta por tanto, en un cambio importante a la norma que adoptamos en Flores Román v. Ramos González, *supra*. Hoy es posible que un contratista independiente tenga inmunidad bajo el artículo 41.50 del Código de Seguros, siempre y cuando sea uno de los contratistas incluidos en la ley. En conclusión, la norma vigente para saber si un médico goza de inmunidad contra demandas por impericia es que si luego de analizar los primeros tres factores que explicamos en el caso de Flores Román v. Ramos González, *supra*,[13] se determina que la relación del médico con el gobierno no es de contratista independiente, éste estará cobijado por la inmunidad establecida en el artículo 41.50. Esta inmunidad también aplicará a aquellos médicos que sean contratistas de una instalación médico-hospitalaria propiedad del Estado Libre Asociado, sus dependencias, instrumentalidades o municipios, sin importar si la instalación es administrada

....

Es necesario aclarar además que la presente enmienda no tiene el propósito ni el efecto de convertir a los médicos que brindan sus servicios como empleados o contratistas de entidades privadas que contratan la administración de facilidades propiedad de entidades gubernamentales en empleados ni agentes del Estado Libre Asociado ni de sus municipios. Finalmente, se aclara que, en el caso de acuerdos de afiliación entre la Universidad de Puerto Rico e instituciones privadas sin fines de lucro, no se exime de responsabilidad por impericia médica a dichas instituciones privadas cuando el alegado acto de impericia médica es cometido por empleados o agentes que no estén exentos en virtud del Artículo enmendado.

[13] 1. La forma en que los servicios fueron pagados; 2. La inversión en equipo científico y en facilidades o el grado de dependencia en el equipo suministrado por el gobierno; 3. Si se le requiere un seguro de responsabilidad profesional.

u operada por una entidad privada, exclusivamente en las especialidades de obstetricia, ortopedia, cirugía general o trauma. Así que los médicos que trabajen para el Estado o una entidad del Estado administrada por una entidad privada en estas cuatro áreas siempre estarán cubiertos por la inmunidad sean contratistas independientes o no.

Ya que el trabajo del doctor Vigo Prieto como parte del PPIU del Recinto de Ciencias Médicas a través del grupo de neurocirugía no está dentro de las cuatro áreas de trabajo antes mencionadas, nos toca determinar si su labor bajo el plan equivale a la de un empleado o la de un contratista independiente. Para esto es necesario estudiar la estructura y propósito de los PPIU del Recinto de Ciencias Médicas.

IV

En 1996, los legisladores autorizaron a la Universidad de Puerto Rico a crear en sus unidades los Planes de Práctica Intramural Universitaria. Ley núm. 174 del 31 de agosto de 1996, 18 L.P.R.A. § 612 (2002). Entre los propósitos de la creación de estos planes en los distintos recintos se encuentra ofrecer a la facultad opciones de retribución acordes con las realidades económicas y profesionales de Puerto Rico, crear recursos económicos adicionales para facilitar el reclutamiento y la retención del personal docente, fortalecer el presupuesto institucional, complementar el ingreso del personal que presta los servicios, así como utilizarlos de taller de práctica para los estudiantes. Véase Exposición de Motivos de la Ley núm. 174 del 31 de agosto de 1996. Al amparo de los Planes de Práctica Intramural Universitaria las unidades de la Universidad pueden

contratar con personas e instituciones públicas y privadas, domésticas o extranjeras, para que su personal les preste servicios. Estos servicios son prestados de forma voluntaria por el personal docente y pueden darse durante su horario regular o fuera de éste, sin menoscabo de su carga académica. Los Planes de Práctica Intramural Universitaria deben ser autosuficientes. Los fondos que recauda la Universidad bajo estos planes son considerados fondos públicos, y son consignados en un fondo especial en las unidades que los generen. Los fondos que generan los PPIU se utilizan para sufragar los gastos directos del programa y para pagar al personal participante. También se utiliza el dinero para fortalecer otros planes con menor demanda, para atender gastos no recurrentes prioritarios dentro de la misma unidad de la Universidad y para hacer una aportación anual al Fondo General de la Universidad de Puerto Rico. Ley núm. 174 del 31 de agosto de 1996. Los contratos hechos al amparo de los PPIU son otorgados a nombre de la Universidad de Puerto Rico y son suscritos en representación de ésta por el Rector de la unidad correspondiente. Artículo XII, Certificación núm. 123 1996-97 de la Junta de Síndicos de la Universidad de Puerto Rico.

Cada unidad del sistema establece la estructura de sus PPIU en conformidad con el Reglamento aprobado por la Junta de Síndicos para esto. Por consiguiente, debemos estudiar las Normas y Procedimientos del Plan de Práctica Intramural del Recinto Ciencias Médicas, para analizar si el doctor Vigo Prieto es un médico cobijado por la inmunidad del artículo 41.50 a la luz de los factores de Flores Román v. Ramos González, *supra*.

Las normas del Recinto de Ciencias Médicas establecen en cuanto a la utilización y el manejo de fondos que toda recaudación por servicios prestados bajo los PPIU se ingresarán a un Fondo Especial que a su vez tendrá cuentas para cada PPIU del Recinto. Una vez se ingresan los recaudos por los servicios sólo se autorizarán desembolsos cuando las cuentas tengan balance disponible y se hayan cubiertos los gastos de operación del PPIU. El Departamento de Recursos Fiscales del Recinto es el encargado de cobrar por los servicios, de identificar deudores y hacer las gestiones para el recobro. Luego que se tienen los ingresos netos, éstos se distribuyen entre el Fondo General, el Fondo Institucional, el Fondo del Decanato y la Facultad y el Personal Participante. Estos fondos sirven para fortalecer el presupuesto de la Universidad de Puerto Rico, del Recinto de Ciencias Médicas, y de los distintos decanatos del Recinto. Los fondos que se distribuyen a los docentes y al otro personal participante se pagan como honorarios profesionales. Véase Normas y Procedimientos del Plan de Práctica Intramural Universitaria del Recinto Ciencias Médicas, págs. 6-9(1998). Por esta razón, el dinero pagado a los doctores por los PPIU sujeto a retención se informa en el Formulario 480.6 y los médicos deben cumplir con las leyes fiscales que afectan a los contratistas independientes. Por otra parte, el dinero que reciben los profesores por sus servicios no se puede utilizar para cotizar en el Sistema de Retiro de los Empleados de la Universidad de Puerto Rico. Sección 100.9.1, Certificación núm. 124 1996-97 de la Junta de Síndicos de la Universidad de Puerto Rico.

En otras palabras, los PPIU del Recinto de Ciencias Médicas funcionan de la siguiente manera. El Recinto presta sus facilidades y equipo a los médicos para que rindan servicios a instituciones privadas y públicas. Los médicos sólo prestan sus servicios. El Recinto se encarga de manejar todos los asuntos financieros relacionados con los PPIU. Una vez se obtienen ganancias éstas se distribuyen entre el Recinto y los médicos. De esta manera, la Universidad se asegura de mantener a su facultad y de contar con recursos para sus funciones.

A la luz de este esquema, queda claro que los servicios no son pagados directamente a los médicos y que éstos no realizan ninguna inversión en equipo científico y en facilidades sino que dependen del equipo suministrado por el gobierno. Por tanto, en cuanto a los dos primeros factores que debemos considerar bajo la norma de Flores Román v. Ramos González, *supra*, los médicos serían empleados del Recinto para efectos del artículo 41.50 del Código de Seguros.

En cuanto a si se les requiere un seguro de responsabilidad profesional a los doctores del PPIU, las Normas y Procedimientos del Plan de Práctica Intramural Universitario del Recinto Ciencias Médicas nada disponen.[14] Ante esta situación, y considerados el propósito de los

---

[14] Antes de que se enmendara la ley de la Universidad de Puerto Rico para permitir que la Universidad creara los PPIM y que el Recinto creara las Normas y Procedimientos del Plan de Práctica Intramural del Recinto Ciencias Médicas, el recinto de Ciencias Médicas tenía un reglamento para regular los Planes Intramurales de Práctica Médica, un sistema muy parecido al de los PPIM.

PPIU y su funcionamiento, debemos concluir que los médicos son considerados empleados del Recinto cubiertos entonces por la institución. Por tanto, para efectos del artículo 41.50 del Código de Seguros deberían ser considerados como empleados del Recinto y cobijados por la inmunidad allí establecida.

En este caso, los peticionarios sostienen que el doctor Vigo Prieto tenía un seguro de impericia profesional. Sin embargo, aun si este seguro cubriera al doctor por sus actuaciones en el Recinto y no sólo sus actuaciones en su práctica privada, esto no impide que al doctor Vigo Prieto se le extienda la inmunidad dispuesta por el artículo 41.50. El adquirir un seguro no elimina la protección contra demandas que provee la ley.

Al evaluar la organización de los PPIU a la luz de los tres factores de Flores Román v. Ramos González, *supra*, debemos colegir que los doctores que prestan servicios bajo los PPIU son empleados del Recinto de Ciencias Médicas obijados por la inmunidad del artículo 41.50 del Código de Seguros.

V

Por último, al igual que el Tribunal de Apelaciones, entendemos que existe una controversia sustancial en cuanto si el doctor Vigo Prieto tiene alguna relación con el tratamiento de la menor Vilmary Rodríguez Ortiz en el Hospital San Jorge. Sin embargo, contrario a ese foro concluimos que la sentencia del Tribunal de Primera Instancia no se extendió a esa controversia sino que sus efectos se limitaron a las acciones realizadas por el

---

Bajo ese reglamento el Recinto les proveía a los médicos de un seguro médico.

doctor en el Hospital Pedriático Universitario. A eso se contrae la minuta del 22 de mayo de 2001, a la cual nos refiere, a su vez, la sentencia de instancia. Ese asunto no estaba, pues, ante la consideración del foro apelativo, por lo que encontramos que su decisión de revocar la sentencia en cuanto a este aspecto fue innecesaria.

## VI

Por todo lo anterior, resolvemos que el Tribunal de Primera Instancia tuvo razón al resolver que las actuaciones del doctor Vigo Prieto en el Hospital Pediátrico Universitario están cobijadas por la inmunidad del artículo 41.50. Se confirma, por tanto, la decisión del Tribunal de Apelaciones en cuanto a este aspecto. Se devuelve el caso al Tribunal de Primera Instancia para que se dilucide si el doctor Vigo Prieto tiene alguna relación con el tratamiento de la menor Vilmary Rodríguez Ortiz en el Hospital San Jorge y se determine la responsabilidad, si alguna, que por ello le corresponda.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Roberto Rodríguez Ruiz y Erica
Ortiz Cancel, por sí y en
representación de su hija menor
V.R.O. y la sociedad legal de
gananciales compuesta entre
ambos
    Demandantes-peticionarios

                        CC-2004-383   *Certiorari*

     v.

Hospital San Jorge, Dr. Vigo y
la        sociedad        legal        de
gananciales compuesta por éste
y su esposa Jane Doe, et als
     Demandados-recurridos

*SENTENCIA*

En San Juan, Puerto Rico, a 16 de enero de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la decisión del Tribunal de Apelaciones en cuanto a que las actuaciones del doctor Vigo Prieto en el Hospital Pediátrico Universitario están cobijadas por la inmunidad del artículo 41.50 y se devuelve el caso al Tribunal de Primera Instancia para que se dilucide si el doctor Vigo Prieto tiene alguna relación con el tratamiento de la menor Vilmary Rodríguez Ortiz en el Hospital San Jorge y se determine la responsabilidad, si alguna, que por ello le corresponda.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Asociado señor Fuster Berlingeri concurre sin opinión escrita. El Juez Asociado señor Rivera Pérez no interviene y la Jueza Asociada señora Rodríguez Rodríguez disiente sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo